Good morning. It's hard for me to hear. Can you keep closer maybe to the mic? Can you hear now? Now I can. Okay. Thanks. We have Judge Greenberg with us on the phone. And Judge Krause and I are in the courtroom. We'll go ahead and call our first case, S.C.R.L. v. Attorney General. Good morning, your honors, and may it please the court. Russ Falconer for the petitioners, about to reserve five minutes for rebuttal. We're here this morning to ask the court to do two things. To hold that the existence of a particular social group has been established in this case, and to remand this case to the BIA so that it can consider the claim it ignored the first time around, which is the claim based on persecution by the stepfather, and reconsider the claim based on persecution from the man who stalked the petitioner's daughter. Now, this court has held a couple of times that unless and until the Board of Immigration Appeals acknowledges and adequately explains its decision to abandon the Acosta test, which is the test that focuses only on immutable characteristics. Why don't you just cut right to why you think they haven't, in fact, done that in both MEVG and WGR? In both MEVG and WGR, the Board explicitly says, by adopting this new three-part test, we have not departed from or abandoned the Acosta test. We have not made any additions to that test. And that's simply untrue. Why isn't that just semantics? I mean, they're indicating that they're clarifying the test, and they've also clarified that they're not talking about ocular visibility and discussed social distinction in more detail. It's not semantics because the new requirements that the Board has added to the test substantively change who is and who is not, or which groups are and are not, cognizable under the asylum statute. A couple of examples to illustrate that. In the Fuentes case that was decided under Acosta, the group was held cognizable of former members of the El Salvador National Police. WGR says former members of the Mara 18 gang in El Salvador, not a cognizable group. Those two decisions, irreconcilable, as is the decision in our case. Bill, you don't like the reconciling they did, but they went out in some length, in fact, endeavor to reconcile them, didn't they? They did attempt to reconcile them. I think that reconciliation is unsuccessful for three basic reasons. Before you get into the reasons, let's talk about the standard of review. Are we required to give this de novo review, or is this Chevron deference, or is this something which I find curious in our case law? De novo review is informed by Chevron deference. How are we to look at what they said? The standard is a bit confusing. De novo review subject to Chevron deference is how this court has put it. What do you think that means? It's a legal question, so this court can bring to bear all the traditional tools of statutory construction with appropriate deference to an agency interpretation that is not foreclosed by the language of the statute or unreasonable under the statute. Okay, so we are kind of in Chevron world then, right? That's correct. Okay, so if that's where we are, and they've laid out this three-part test and explained, we're not talking about ocular visibility. We're talking about perception within the society. What's wrong with that, given that we have to look at this in a deferential way, a Chevron deferential way? The primary flaw, we would point to, is twofold. The admitted inconsistency of this new three-part test with the old Acosta one-part test and the agency's failure to acknowledge and adequately explain the fact that it is changing its interpretation of the statute. And MEVG and WGR, the cases on remand from the Valdiviezo decision from this court, point blank, flat out said there is no change in position here, and as Judge McKee and Judge Hardiman both agreed in the Valdiviezo case, that's false. The Fuentes case, the Tedozo-Alfonso case, the Kasinga case, all of those groups passed muster under Acosta. All of them flunked this three-part test. So on the issue of the inconsistency, whether this is a change in ADPT position, Valdiviezo answers that question. We don't have to re-litigate it here. In the test that I just had from you, aside from Chevron, if you looked at the groups that talk about race, religion, these are social groups that without regard to the persecution exist. For example, suppose you had people who were, again, Catholics, Roman Catholics, Jews. I mean, these are groups that exist. But the problem here is that the existence of the social group depends upon the persecution. Because without the persecution, the proposed social group, which is Honduran women, immediate family members of Honduran women unable to leave a domestic relationship, that social group exists because of the persecution. But Catholics and Jews don't exist as a social group because they're persecuted. So I mean, it seems to me that this is a fundamental approach that has no limit. Because once you begin to do this, once you take people that are persecuted, you can find any, you can find different groups of people that are persecuted than define them as a social group. I mean, it's a lot, it's very broad. It's a lot to me. Judge Greenberg, we agree that social groups are not defined and cannot be defined by their members having been persecuted. That's not the definition we're advocating today. That is the definition that the board has adopted under this new three-part test. And we see that most clearly in the ARCG case, where to determine social distinction, the board looks to evidence of persecution and nexus. So the conflation of social group with persecution, that happens under this social distinction element. The group we prefer, immediate family members of women who are unable to leave a relationship, is not defined by the women who are unable to leave having been victims of domestic violence, which is the form of persecution at issue. A woman can be unable to leave a relationship without having been abused, even though abuse is rampant and normal, unfortunately, in Honduran society. We're not asking this court or the BIA to build persecution into the definition of the group. The BIA has done that with its social distinction test, which is another one of the many problems with that test under this court's precedent. But the BIA explicitly disavows that, right? They do. Even in the ARCG. They do. And then I think it's this court's decision in Johnson v. Ashcroft, which this court cited in Valdeviezo, that said it's a hallmark of an unreasonable interpretation under Chevron for an agency to adopt an interpretation that it cannot consistently apply. If it's routinely disregarding its own precedent, ignoring its own precedent, contradicting its own precedent, that's a good sign its interpretation is unreasonable. ARCG tells us that this interpretation is unreasonable because it ignores the portion of MEVG that Judge Crouse just pointed out. Why does ARCG? How is that the case that ARCG ignores it? Because in ARCG, the board's analysis on social distinction was, we're going to look to see if there's evidence of a culture of violence and machismo in Guatemala. Women are routinely the victims of sexual assault and domestic violence. Are there laws enacted to protect them that are not enforced? All of those are relevant considerations on the persecution question, on the nexus question. They only become relevant to a particular social group with the board's new social distinction requirement, and that's one of the ways in which it improperly conflates the elements of the asylum test and causes the board to make these decisions that are inconsistent both under the new three-part test  Can we back up to Judge Jordan's question? Because if you were conceding at the outset that we review here with Chevron deference, why isn't that the end of this case? I had taken your argument from your briefing that Chevron deference should not apply because you thought that the interpretation here was inconsistent with the statute, inconsistent with prior precedent, was arbitrary and capricious. Are you now conceding that Chevron deference applies? No, we're not conceding that Chevron deference applies. The Chevron framework governs this court's review. The BIA's position is an impermissible construction of the statute and an unreasonable construction of the statute, which means it is not entitled to deference under Chevron. The board explained one of the reasons that it's taking this approach is that otherwise the definition would swallow what constitutes a refugee. And so this overlay of social distinction in particularity is a way for an EDG to clarify this social group. What's wrong with that interpretation? And how do you answer the concern that it would otherwise swallow the definition of refugee? Sure. There are three factors I would point to. I'll move through them as quickly as I can. One is the concern that this is relying on the ACOSTA test is going to open some kind of floodgate is empirically unfounded because we've operated under the ACOSTA framework for, I think, 20 years without that problem coming to pass. The second, and as the Seventh Circuit pointed out in its en bas decision in C.C. v. Holder, it is inconsistent with the asylum statute to limit otherwise valid asylum claims because there are too many of them. And finally, I think it's really important to remember that acknowledging, recognizing a social group is not an asylum determination. That's the top of the funnel. And from there they have to show persecution, membership in the group, inability of the government to protect them, no existence of a statutory bar, they can't relocate within the country. So there are many other elements of an asylum determination that sort of check back against this risk that anyone who can articulate a group will receive asylum. But the idea of being part of a particular social group, your legal position is there's no ambiguity in that? How does the Chevron framework work here? So we agree, I think we've conceded that the term is ambiguous, as Fatim establishes, but an ambiguous term doesn't give the agency license to interpret that term in a way that's contrary to its meaning. No, but it does give it license to interpret the term, right? Of course, within the limits imposed by the language of the statute itself and the board's prior interpretations of that term. Wait a second when you say, and the board's prior interpretations of that term. What is it in Chevron, or otherwise in the law, that makes you believe that the BIA is not entitled to use its experience over the course of time to refine the test that it uses to determine whether there's a particular social group that a person, a refugee, fits within? Of course the BIA is entitled to refine its test, evolve its interpretation. And that's what it's claimed to have done here, right? It has claimed that, and that claim is incorrect. Because the three-part test produces results that are directly in odds with the results produced by ACOSTA. And as Judge Hardiman explained in Valdezzo, if the agency wants to be forthright and intellectually honest about what it's done, acknowledge the change, and provide a reasoned explanation for that change, that's a different question under Chevron. Well, wait a second. If you're looking to Judge Hardiman's concurrence, I'm sure that Ms. Glazer will speak for herself on behalf of the government, but I kind of expect from the briefing that the answer will be, we just did that. That's what NVGR is. That is the reasoned explanation. We don't have to accept your assertion that this is a big change in the law. We can tell you we thought we were doing this before, but if this helps, here's our clarification. We never meant ocular when we talked about disability. That isn't what we intended before, but let's just make it clear that isn't what we mean now. So if that's what they're getting at, why isn't that exactly the kind of thing that Judge Hardiman was looking for, a reasoned explanation for this approach to the law that they've taken? It doesn't address Judge Hardiman's concerns, because the problem with this change is not just ocular visibility. It's the substantive differences in groups that are recognized under ACOSTA versus groups that are recognized now. So if I've got it straight, you believe this test can never be applied consistently. Is that it? That's a further question of whether the Board has acknowledged the change and you've been honest about its reasons for making the change. And on that point, I'd report the Court to Judge McKee and Judge Hardiman's language that under ACOSTA, those three groups in the cases we've identified, Kasinga, Fuentes, and Tedozo-Alfonso, recognized under ACOSTA and not recognized under the three-part test. When you say it's recognized under ACOSTA, what actually happened in Fuentes? I've been a little interested in that, because we kind of indicated that that was the case. But when I took a look at that, it looked to me like the BIA didn't necessarily hold that members of the National Police Force of El Salvador would constitute a group. That was something that got maybe overstated a little bit in the Seventh Circuit's precedent and then picked up by ours. Was it in fact the case that Fuentes did what you're saying it did here? My recollection is I don't want to unqualifiedly represent that without double-checking, which I can during counsel's argument. The Tedozo-Alfonso group, the Kasinga groups, were certainly unequivocally recognized, and those are both groups that were recognized under ACOSTA that would not be recognized now. And that's a substantive change in position, not just a semantic change that the Board can cure by changing social visibility to social distinction. And CA, didn't the Board itself list Fuentes as identifying PSG of the former police officers?  In several other cases, the Board has treated Fuentes as establishing that proposition. Did you agree there is some limit to what constitutes a PSG? Of course. The ACOSTA test establishes a limit of a common immutable characteristic that cannot or should not have to be changed. But if the Board's experience over time is that any past experience then becomes an immutable characteristic, and so if there's going to be a limit on PSGs, for example, wealthy Guatemalans, that there needs to be some framework to apply there, some standard that immigration judges and courts can address. Why isn't the social distinction at a minimum particularity when the term that we're dealing with is particular social group? How can we really say that a requirement of particularity is inconsistent with the statute, that that's an unreasonable interpretation, once you agree that there needs to be some limiting principle? We do agree there needs to be some limiting principle. ACOSTA provides a limiting principle, and it provides the particularity limiting principle that the Board has now separately defined, and immutable characteristic is one whose contours are particularly defined by definition. The BIA doesn't think so. And aren't they entrusted with the responsibility to make that judgment about how to apply this conceitedly ambiguous term? Well, before you answer that, let me just ask this. By my count, and maybe I got it wrong, and I might rely on these excellent law clerks I've got, but it looks like the 1st, the 2nd, the 4th, the 5th, the 8th, the 10th, the 11th, and in the Ray's case, the 9th Circuit, have all thought this was okay, what the BIA has done. Right? That's correct. There is an existing circuit split on this question. No, it's not just an existing circuit split. Wouldn't you have to acknowledge that the overwhelming majority of circuits that have looked at this have said, the BIA is okay. They've done the right thing. They've done what they are permitted to do here. You are running into the teeth of multiple circuit courts that have looked at it, most recently the 9th Circuit and Ray's, and said, this is adequate. So we're supposed to decide that all those sister circuits are not just wrong, but they're so wrong that in the Chevron deference world, they're completely, completely wrong. That's got to be the position you've got, right? Well, where the government has quality, I think we've got quality. None of the other circuits have analyzed this issue to the depth and sophistication that this court did in Valdeviezo. Did Ray's just look at it? Didn't the 9th Circuit just barely look at it in light of these new BIA decisions? It did. It did. And the Valdeviezo analysis, we think, is still more pervasive and especially more consistent with Supreme Court precedent on what an agency has to do before it changes its position. But Valdeviezo was pre the changes that you're complaining about, right? And Ray's, after that, looks at it and says, this is adequate. So we haven't looked at it since, but the 9th Circuit did and was content with it. What was flawed in the 9th Circuit's analysis? I can't speak off the top of my head specifically to the 9th Circuit analysis, but I can speak to why the MEVG explanation is limited in its ability to correct these problems that Valdeviezo identified, which is the basic principle of iterationary, that a court doesn't rewrite an agency's papers. It grades the agency's papers. The agency is limited to defending what it did based on the reasons it stated at the time. And no one, not the government, not the BIA, no one actually says that they apply this three-part test in matters CA and SEG and WGR and these other cases. What the BIA has tried to do is go back and retrofit these cases and say, we didn't use this test, but they're actually consistent with it. Now, the agency's wrong, but it doesn't matter because that's not the rationale they relied on at the time. All right. We'll have you back on rebuttal, Mr. Falkner. Thank you. Good morning, Your Honors. May it please the Court, Sherry Glazer appearing on behalf of the United States Attorney General. Now, Your Honors, SCRL in this case simply failed to meet her burden to present evidence compelling the conclusion that she's eligible for asylum or withholding of removal. Now, oh, I'm sorry. I was going to say, why don't you just head right into and take on Mr. Falkner's point directly that what we're dealing here with is just a failure by the BIA to abide by what we had said in the Valdevezo-Galdenes, and I hope I'm saying that name right, case. Sure. They say you essentially ignored what we said and you changed the word, but that's all you changed. It's the same test we rejected before. What's the response? The response is I wholly disagree with that. The Court had several concerns in the Valdevezo case. One was that social visibility was inconsistent with past decisions because there was no requirement under ACOSTA that these groups have a characteristic that was outwardly recognizable. And then piggybacking on that, this Court rejected the idea that the term social visibility didn't require on-site visibility because that word visibility literally meant something that you can see outwardly, not an internal trait. This Court also had trouble discerning the difference between particularity and social visibility and was concerned that the Board didn't give a principled reason for particularity and social visibility. And the Board in MEDG and WGR responded to all of these concerns. The Board started out the decision by emphasizing that social distinction and particularity are not a reversal or an abandonment of anything under ACOSTA. Really, they were just a means to achieve what the Board intended to achieve in ACOSTA. What is the difference between a discrete group and a distinct group? A discrete group is really talking about the boundaries of the group. And whatever the proposed social group is, that we can look at it and we can see who exactly is going to be a member of the group, that it's not defined by terms that are vague or subjective and we wouldn't be able to tell who would be part of the group. For example, the term wealth or the term poverty, they can be defined in different ways and if we have that term in a particular group, we might not know exactly who is going to be a member because different people think of those terms in different ways. So that's what particularity refers to in terms of discrete. And then the social distinction requirement has you look at the perception of society and whether society perceives individuals who have this common immutable characteristic as being set apart or distinct from people who don't have the characteristic. Why don't we back into the world of these being oscillating or obfuscating in terms of a total overlap? Every example that the Board gives, even in MEVG in its attempt to distinguish prior cases, those two new criteria either succeed or fail together. Is there any example you can give us of a PSG that is particular but not socially distinct or vice versa? That is particular but not socially distinct? I'm not sure I understand your question. These are supposed to be two different requirements and if this interpretation stands, immigration judges are supposed to be applying them, understanding their meaning. How are they two different requirements? Is there any example of a PSG where you would have one and not the other? And if there's complete overlap, if what we're really talking about is that it is a particular social group, why isn't that already inherent in the immutable characteristic? I don't know of any case off the top of my head where in either a published decision or an unpublished decision, the Board has found, okay, this group is, for example, not sufficiently particular but it's socially distinct. Well, the question isn't whether it's happened, it's a hypothetical question, right? Can you... Can I think of an example? I guess the first thing that occurs to me, and I'll have to sort of flesh it out as I'm talking, would be something with the term wealth in it. Where if a group, that's very difficult off the top of my head, but had that word in the name that it would be too difficult to tell who exactly would be a member because different people think of wealth in different ways depending on, for example, maybe how they grew up or what their situation currently is. But it doesn't necessarily mean that society does not perceive people with that characteristic as maybe set apart from people who don't have it. Does that make any sense? Well, if you don't know what the term means and you're looking to how a society identifies that group and if they're able to identify that group as having a particular characteristic, don't they seem to be one and the same question? I don't think so because I think the social distinction really goes to people who have that common immutable characteristic and particularity. That sort of makes the point that social distinction goes to people who have that characteristic and particularity goes to really who is a member of the quote-unquote group. So I do think they play two different roles in ending up in determining whether it is a legally cognizable particular social group. What is the role here of international law? I ask that against the backdrop of the Refugee Act being based on the U.N. protocol, which also uses the term particular social group, and the Supreme Court in Cardozo-Fonseca discussing that it mirrors the protocol, that one of Congress' primary purposes was to bring the Refugee Act in line with that protocol, and observing that the conference committee report stated the definition was accepted with the understanding it was based directly on the language of the protocol and was intended to be construed consistent with the protocol. The U.N. guidelines for international protection define PSG as a group who share a common characteristic or are perceived as a group by society, and other countries interpreting that protocol have similarly done it in the disjunctive, not added on a separate particularity requirement or social distinction requirement on top of the immutable characteristic. Given that this is deriving from a treaty and that both Congress and the Supreme Court have said it should be interpreted consistently, isn't it relevant that both the U.N. and other countries that are implementing it  have expanded the definition with the disjunctive, not the conjunctive, that narrows the definition further? Even though sort of this particular social group idea has come from that, I really think we need to look at what we've done in this country and what the board did explain in MEBG, that it is more than just having this common immutable characteristic. It's this common immutable characteristic that separates different factions in whatever society the person came from. So I don't think it's a problem that the board has created this test that's not a disjunctive, that's more inclusive with all of it, and I actually think it's quite reasonable and it makes a lot of sense when we look at, for example, the group in ARCG that married women who are unable to leave a domestic relationship. I really think it makes sense that you look at how society has perceived, these individuals as set apart and whether we can determine who is a member. It's very easy with that definition to determine who is a member. It doesn't matter if there's diversity, it doesn't matter if there's numerosity, and these women obviously all do share a common immutable characteristic. I think all the board was doing, and I don't think it's a problem, was evolving its case law. How is ARCG, you just heard Mr. Faulkner suggest, that that's an inconsistent decision? It's not consistent with your own test. What's your response? My response is I disagree with that. I figured you would, but why? What the board did in that case is it looked at exactly what one would think it looked at. It looked at its boundaries to see whether they were vague and subjective or whether we could determine who is a member of the group, whether being a married woman in that country who is unable to leave her relationship is something that's immutable, and it is. Then we looked at the views of society and how society perceives these individuals. There's a part of the decision that looks at the fact that the woman in that case, the applicant, went to the police to try to get some help, and the police said to her, no, we will not at all get involved in your relationship because you're married, and looked at other factors and country conditions. How is that consistent with the board's decision here? It's consistent with the board's decision because when it comes to social distinction, the board really emphasizes that we look at the perception of society. At one point, with regards to that, it's... Well, hold on. When you say the perceptions of society, on what basis, on what factual basis, does the board make a determination that if you're in Guatemala and you're in a relationship as a wife with somebody who's beating you up, then society recognizes. We know Guatemalan society recognizes that. But you go across the border into Honduras, and you ask the question about family members, not necessarily the wife alone, but family members, who feel compelled to stay because of the violence in the family. What can you point to that the board relied on to say, well, in Honduras, that's just not something that's socially distinct or recognized? What did the board have? In this case, I'm glad you brought up that point. What petitioners rely on is evidence that Honduran women experience, unfortunately, what seems like quite a bit of violence in that country. And there's two points I'd like to make, is that the social group that they propose is not simply Honduran women who experience violence. It's immediate relatives. Right. So I'm asking you, and I may not have been clear about it, but I'm asking you, you've made the assertion on behalf of the board that this is something that the board can do because of what's perceived in that society. What did the board rely on to say, it is consistent for us to recognize in ARCG women who are abused as a distinct social group, recognized by that society. But step across the border into Honduras and say, it is not recognized in that society that family members in an abusive family are also a recognized social group. What's the distinction there? Or is this just the board saying, yeah, that's a little too broad. We're uncomfortable. No, it's the board looking at the evidence in this case and finding that petitioners did not submit anything to show that immediate relatives of Honduran women who are unable to leave a relationship, that those immediate relatives are seen. So it's a burden proof issue. It's a burden proof issue, exactly. And again, petitioners point to this evidence of violence in Honduras, but if they're pointing to that evidence and they're saying that that supports their argument that this is a legally cognizable particular social group, they're essentially arguing that all mothers, fathers, sisters, and brothers of what seems like an enormous majority of Honduran women are part of this group that they're setting forth, which completely cuts against what social distinction is supposed to mean. It's not the entirety of society. It's a subset of society that's seen as a discrete group. And there's absolutely no evidence of that in this case. But doesn't that point up the problem that what the board seems to be doing conflates PSG with the nexus requirement? I don't think it does at all, and that's another good point. There's been contentions in one of the amicus briefs in the petitioner's brief that the board somewhere says, and it never says this, that you cannot at all look at the perception of the persecutor, and that's not true. The board never said that. The board said you cannot look only at the perception of the persecutor. But if what we're looking at is whether a group can be identified, whether it is a group that you can conceptualize in a way that can be separated from the rest of society, and we know that immediate family members can fit that category, and we know that women who are abused in domestic relationships they can't leave fit that category, when you put those two together, why isn't it even more precise and distinct than either of those two standing alone? Well, I think it's an attractive argument to say that, you know, we've found in other cases that immediate family is a legally cognizable group, and we've found that women unable to leave a domestic relationship is, but that doesn't mean when you put the two of them together that they're seen as a distinct group in society. Again, it would encompass all of Honduran society, essentially, this group that they're setting forward, and that's why it's so important to look at. Well, isn't that the problem that fundamentally, I guess, we're dealing with here is an implication, at least from the other side, that this is all seat-of-the-pants stuff by the BIA because they're concerned if the group gets too big, not because there are actually distinctions and fine distinctions that can be made, it's just a kind of a gut feeling that, oh, my gosh, if we say that, then we've made everybody in Honduras a refugee. Well, I don't think that's what the board's decision hinged on at all. If you have a group that is large and there is, I can't think of an example off the top of my head, I probably should have put some thought into it beforehand, but is extraordinarily large and it is still seen, the individuals who have this characteristic, if there's evidence that they are seen as a group set apart from individuals who don't, then it would be a different situation. We just don't have that in this case. Isn't that the nexus question, not whether they're seen a certain way? The immutable characteristic concept that seemed to have worked fairly well with Acosta for decades is one that allows you to identify a characteristic and then you go on to ask a host of questions before anyone can get refugee status, right, including whether they can prove they're actually a member, whether there is a nexus that's on account of that protected characteristic, the severity of it, the government's willingness to allow it to proceed, the relocation question. So why isn't the question at the PSG level, that threshold question, simply can you identify in a definable way what this group is, what the alleged characteristic is, and then you proceed with the analysis? Well, my response to that would be what this court brought up earlier, then you're in a situation like the board has recognized, as this has all evolved, that any past characteristic can render someone to be a member of a legally cognizable group, and it is very important to keep the issue of whether somebody is a member completely separate from the issue of whether the person was harmed or fears harm on account of membership in that group. And like the board pointed out, you know, this whole point in matter of Acosta was to look at a particular social group in the context of where it is in the statute, which is next to these other four protected grounds. And the board does a very good job in MEVG explaining that a particular social group doesn't just have a common immutable characteristic in common with these other four characteristics, that it's a common immutable characteristic that separates factions in society, and that's where particularity and social distinction really come in to help identify those different factions and determining whether someone even can set forth an enumerated ground, and then you move on to whether the person fears harm or was harmed on account of that. And these are all very important questions, and you are correct that, I guess, you still always have to look at whether the harm was on account of that ground, but the question can stop, the case can stop if the person hasn't even set forth an enumerated ground. When we're dealing with past persecution, you have to show that the harm rises to the level of persecution, that the government's unwilling and unable to protect the individual and the nexus, but we still have to know what rises to the level of persecution. We can't just move forward to the other questions. But in terms of the evidence of that, the board itself is looking to the same types of evidence that it looks for in nexus. I mean, if the category is homosexuals in Cuba, and the way they're defined as socially distinct is to see that they are persecuted, that they're registered by the government, that people are throwing things at members of this group, and that's what defines it as being particular, then we've just conflated those two different steps of an inquiry. One point I'd like to make, I don't exactly agree with that, because in that case, the individuals that the applicant feared was at the hands of the government, but the board didn't just look at how the government, the persecutor, treated that applicant. The board also looked at, what you pointed out, how society treated the applicant, and that's also played into whether the group was socially distinct, and that plays into why you can't just look at the persecutor's perspective and why the persecutor targeted that person, what the persecutor did, because then you blend those two issues. Persecution can be by private hands with the government's unwillingness to interfere, so looking at private parties who are engaged in persecution and the government engaged in persecution doesn't separate out from us the nexus inquiry from defining the PSG. I think it does. I think there's still two separate inquiries. You should have to meet so many other requirements to be a particular social group. It's not just that one. So you meet all of these requirements, and then you look to see why the individual was targeted. I do think they're two completely separate inquiries, and I think it's very important to keep them separate. All right. Thank you, Ms. Glaser. Thank you. Mr. Falconer, you were about a place. Thank you, Your Honor. Two points on rebuttal. One is I want to emphasize that we spent the majority of my opening argument talking about whether this is a proper test. I want to emphasize that even if the court applies this three-part test, it was legal error for the board to conclude that our particular social group was not cognizable. And the second point is why? Because under the most coherent articulations of particularity and social distinction, this group is particular and socially distinct. Well, they say you provided no evidence of that. They're making a burden-proof argument. If you want to say that she fits within a particular social group, it's on you to demonstrate that, in fact, in Honduran society, the members of the families of people who are suffering domestic violence can't leave there. They fit within a recognized group, et cetera. What was the evidence you produced for that fact, that assertion of fact? So the burden-proof issue, I think, goes primarily to social distinction. I'll address that and then address particularity. The evidence on social distinction, for me, the easiest way to think about it has been this group is like family plus. The government is not arguing on appeal that family is socially distinct as a concept in Honduran society. And we've got a family here that shares a distinctive experience. Now you're arguing a legal point, it feels like. I took their argument to be you've got a factual burden to bear. You're a factual burden to bear. It's not satisfied by saying something abstract like in the past you recognized kinship and in the past you recognized domestic violence and, therefore, you can put those things together. That's like a mathematical equation, utterly abstract. I understand them to be saying there is a factual question about Honduran society and no evidence was adduced on that. What's wrong with that argument? What's wrong with that argument is there was relevant evidence adduced on that question, two different kinds. The first is evidence that family as a concept is meaningful in Honduran society, that it's a way that distinguishes people in the eyes of each other. That was uncontested below. The BIA did not contest that. The government has not contested it on their brief. It's like a summary judgment point. There's no evidence to the contrary. If family is socially distinct, is a subgroup of family in which one member of that family is trapped in a domestic relationship she can't leave, is that also socially distinct and for the reasons... Socially distinct and recognized, right? Correct. Okay. I never understood their argument to be that family wasn't recognized as important in Honduran society. Quite the contrary. Right. I understood their argument to be that you didn't do anything to demonstrate that Honduran society recognizes family members, not the person abused, not the spouse, but members of the family generally are recognized in Honduran society. So they're a group that is... And we know that they're a group that is something we would view as one would view the homosexual community in Cuba or some other... or former police officers in a regime. What's your response to that? The response to that is each family in Honduran society is viewed as those groups that Your Honor just mentioned. Socially distinct, set apart from others in a socially meaningful way. The fact that a given family has one member who's going through a distinctive experience makes that family more distinct, not less. And that's all the country conditions evidence that we put in. It was identical to the country conditions evidence from ARCG. So you're saying the Honduran society... You put in evidence to show that Honduran society has a perception that there are abusive families. In this society we see abusive families. What is your factual argument? No, Your Honor, it's not abusive families because that gets into the conflation problem defining the group by persecution that we have avoided that the BIA has stepped into. The group is families with family members of a woman who is trapped in a relationship she's unable to leave. It's undisputed on this record that each family in Honduran society is a socially distinct group. And families who have one member who is trapped in a relationship she can't leave do not become undistinct and unrecognized in Honduran society because of that woman's experience. As Judge Krause, I think, aptly put it, they become more distinct because that separates them in an additional way from people who are not in that family. I think we're just talking past each other. So let me give this one last shot. I take the government's argument to be that they're entitled to define refugees according to particular social groups. And that their definition of particular social group under their precedent means you have to have demonstrated that the society in which this group is alleged to exist is one that the society itself recognizes. So it's not enough to say Honduran society recognizes families, that Honduran society recognizes as a distinct group families in which there's an abusive relationship and family members feel like they can't get out. Because that's the group you're alleging. And you have to allege, they say, that Honduran society would have to perceive that to be a group. Now, stepping away from all your arguments about that conflates this or that, are they correct that if their test is a valid one, that it is what the society recognizes that is factually important? Yes, that's how the BIA has defined the test. Okay, and if that's the case, if it's what society recognizes that's factually important, did you deduce any evidence that in Honduran society, Hondurans say, wait a second, that's a family where no one can get out because the wife is being abused. That's something Hondurans look at and see. The evidence that we deduced on a particular social group was, I think, a combination, I mean, it's an inference from evidence of family being a particular social group and women unable to leave their relationship. In terms of the record, you and Amicus make reference to at least one report that talks about the need for protection of the women and their family members. Is there anything else in the record that suggests that immediate family members are perceived themselves as a discrete group in this context? So I have to, to the best of my knowledge, the special rapporteur's report that the Amicus cited in their brief, I don't believe that's in our record. I feel obligated to point that out. The evidence that we put in under another report from the special rapporteur, some State Department country conditions evidence, indicates that domestic violence is a systemic problem within families, that when one person is abused there is a spillover effect, especially on children, which is exactly what happened to the petitioner here. That evidence from, I believe it's the State Department country conditions report and a separate report from the UN rapporteur is in the record. Okay. I know we've got you up there longer than your time, but I do have one final question, and then I'll ask Judge Greenberg if he has anything. I don't have any questions. Okay, thanks very much. Is there, can you tell us anything about the status, there was a petition to reopen, am I right, with the BIA? That's correct, and I believe that petition has been denied. Okay, thank you. Thank you, Your Honor. Thank you both counsel for a well-argued case. We've got the matter under review.